# EXHIBIT 4



255 E. Fifth Street
Suite 1900
Cincinnati, Ohio 45202

513.977.8200
Dinsmore.com

Elizabeth M. Shaffer
elizabeth.shaffer@dinsmore.com
513.977.8128

February 28, 2022

*Via Email*

Norman A. Abood
Law Office of Norman A. Abood
101 Broadcast Building
136 North Huron Street
Toledo, OH 43604
norman@nabood.com

> Re:    Denzelle Tucker – SBTPG Escrow Account/Fees Due and Owing

Dear Norman:

I represent Green Dot Corporation ("Green Dot") and Santa Barbara Tax Products Group ("SBTPG"), and write in response to your February 1, 2022 letter to Green Dot's General Counsel Kristina Lockwood and SBTPG's Senior Director – Alliance Partnership, Christopher Bagg, regarding your client Denzelle Tucker, as well as in response to our follow-up discussions.

In your letter, you allege that both Mr. Tucker and his previous counsel, David Cocke, were repeatedly "stalled" and "brushed-off" in their efforts to obtain information about the status of certain fees allegedly owing to Mr. Tucker, and that they received only unsatisfactory and "nonspecific" information in return. This is not correct. Green Dot sent Mr. Cocke a letter on April 23, 2021 (attached hereto as Exhibit A), explaining the situation in detail. Green Dot never received a response from Mr. Cocke.

Mr. Tucker himself reached out to Green Dot directly by email on July 12, 2021, with two letters attached: one dated June 4, 2021, laying out Mr. Tucker's view of the dispute, and another dated July 9, 2021, requesting a response to the earlier correspondence (attached hereto as Exhibit B).[1] Green Dot responded to him on July 27, 2021, again providing a thorough explanation of the status of the funds (attached hereto as Exhibit C).

As Green Dot explained in its letters to both Mr. Cocke and Mr. Tucker, SBTPG, which is a wholly-owned subsidiary of Green Dot, conducted an investigation in coordination with the Internal Revenue Service ("IRS") into the operations of Tax Solutions. This investigation, which

---

[1] As shown in Exhibit B, the letter received by Green Dot on July 12, 2021 is dated June 4, 2021.

Norman A. Abood
February 28, 2022
Page 2

began in February of 2021, identified numerous indicia of fraud pertaining to tax refunds owed to taxpayers who had utilized Tax Solutions' refund transfer services. SBTPG thus held the tax refund amounts – which included the tax preparation fees which Mr. Tucker alleges are due to him – until April 21, 2021, on which date the IRS determined that those tax refunds had been issued in error. The IRS instructed SBTPG to promptly return the tax refunds to the Bureau of Fiscal Service of the United States Department of the Treasury. SBTPG immediately complied. Green Dot made clear in its letter to Mr. Cocke that processing of the returned tax refunds could potentially take several weeks, instructed him that he would need to contact the IRS directly for further information, and provided the associated reference number that it had at that time.

On December 17, 2020, your client executed a Financial Services Agreement ("FSA") with SBTPG (attached hereto as Exhibit D). Section 4.5 of the FSA provides that SBTPG "may, in its sole discretion, freeze, reverse, debit or refuse to remit from [SBTPG]'s account via ACH Participant Service Fee payments (i) that are associated with tax returns that are in dispute or activity that [TPG] considers fraudulent or suspicious…," with "Participant Service Fees" defined in the FSA, and herein, as the "tax preparation/electronic filing fee" due to the tax preparer. Furthermore, Section 3.6 of the FSA provides that "any suspicion of fraud by [SBTPG] or Bank among Participant's requests may result in Participant's immediate suspension or termination from the Program, and withholding the remittance of Participant Service Fee Payments[.]" In or around the first week of March 2021, SBTPG communicated to Mr. Tucker through a phone call that the following "red flags" contributed to the termination of its relationship with him: address/name mismatch; taxpayers with the same 900 phone number located in various states; e-mail addresses duplicated on multiple returns located in various states; ID theft claims by taxpayers; excessive tax preparation fees; and commonalities in tax return characteristics that seemed unusual. There is no prescribed method in the FSA of providing notice for terminating a customer from the program.

SBTPG is and has acted in complete compliance with its obligations and rights under the FSA at all times relevant to Mr. Tucker's dispute. Furthermore, as SBTPG has previously informed Mr. Tucker, SBTPG returned the disputed tax refunds in its possession to the IRS at the IRS' request, pursuant to its investigation. SBTPG no longer has those funds in its possession.

Now that you have been made aware of the full circumstances of this matter, I anticipate that you will be able to address Mr. Tucker's concerns without resort to legal action. SBTPG has at all relevant times conducted itself in accordance with both the FSA and all applicable law, and a lawsuit based upon these facts would be unavailing, as well as a needless expenditure of time, money, and effort. However, if Mr. Tucker chooses to move forward with legal action against SBTPG and/or Green Dot, we will certainly utilize all legal defenses at our disposal.

Norman A. Abood
February 28, 2022
Page 3

Sincerely,

*/s/ Elizabeth M. Shaffer*

Elizabeth M. Shaffer
Dinsmore & Shohl LLP

Attorney for Green Dot Bank and Santa
Barbara Tax Products Group.

# EXHIBIT A

April 23, 2021

*Via E-mail*

David Cocke
Evans Petree PC
1715 Aaron Brenner Drive, Ste. 800
Memphis, Tennessee 38120

Dear Mr. Cocke,

Santa Barbara Tax Products Group, LLC ("TPG"), a wholly-owned subsidiary of Green Dot Corporation, has received your e-mail correspondence on behalf of your client, Denzelle Tucker, inquiring about the status of taxpayer accounts and refunds and tax preparation fees that you state are due to your client. In review of the matter, and in coordination with the Internal Revenue Service ("IRS"), we have identified numerous indicia of potential fraud associated with the tax preparation operations at your client's office.

While we conducted an investigation from mid-February to date, the IRS instructed us to withhold customer tax refunds received from the IRS and held by Civista Bank in connection with tax returns submitted by your client ("Tax Refunds"). The Financial Services Agreement ("FSA") that your client agreed to and executed on December 17, 2020 further provides in section 4.5 that TPG "may, in its sole discretion, freeze, reverse, debit or refuse to remit from [TPG]'s account via ACH Participant Service Fee payments (i) that are associated with tax returns that are in dispute or activity that [TPG] considers fraudulent or suspicious...," with "Participant Service Fees" defined in the FSA, and herein, as the "tax preparation/electronic filing fee" due to the tax preparer. In addition, section 3.6 states "any suspicion of fraud by [TPG] or Bank among Participant's requests may result in Participant's immediate suspension or termination from the Program, and withholding the remittance of Participant Service Fee Payments...." As such, TPG has the right to withhold the following monies in its possession: i) $743,170.26 comprised of Tax Refunds, and ii) $507,182.38 comprised of Participant Service Fees (collectively, the "Withheld Amounts"). TPG also had the right to terminate your client from the program offered by TPG, and contemplated in the FSA, on March 1, 2021.

As of April 21, 2021, the IRS has definitively determined that it had issued certain Tax Refunds in error and has instructed us to return the Withheld Amounts to the Bureau of Fiscal Service of the United States Department of the Treasury immediately. We have been advised that the processing of these Withheld Amounts may take several weeks. To resolve the matter, you must contact the IRS and reference lead # 042021 04.

As a matter of record, TPG did not send any notifications or communications to your client's customers on March 3rd regarding the status of their refunds, as stated in your April 14, 2021 e-mail.

Regards,

Kristen Juhan
Corporate Counsel



3465 E. Foothill Blvd. • Pasadena, CA  91107 • www.GreenDot.com

# EXHIBIT B

Via E-mail
Via-E Certified Return Receipt
Via-Facsimile

July 9, 2021

Dear Ms. Juhan:

It has now been thirty (30) days since I sent you my letter, can you please reach out to me regarding this matter. Your company is constantly sending me letters in the mail, which leads me to believe that I am not in the wrong. I have given you and your company all of the proof that you need in order for my funds to be released.

When you receive this letter, please feel free to contact me, I am attaching all off the documents that I have received since this incident as transpired. (See ATTACHED DOCUMENTS).

Hope to hear from you soon.

Sincerely,

Denzelle Tucker

June 4, 2021

Via Email
Via E-Certified Return Receipt
Via Facsimile

Attn: Kristen Juhan
Green Dot Corporation
3465 E. Foothill Blvd
Pasadena, CA 91107

Dear Ms. Juhan:

It has been over 120 days since the freezing of my account. After further and diligent investigations, I have come to the conclusion that not only what your company is doing is illegal but it is unethical. In February, 2021, your company froze my account due to suspicious activity, but you never fully investigated the activity according to our records, neither did you give me proper notice, you only sent out a TPG enrollment update on March 1, 2021 as shown in "Exhibit A"; your company only went based upon tax-filer's complaints, which is no grounds to freeze an account unless you have done proper investigation.

To begin with, I asked your company repeatedly to show your proof, and you have failed to do so. In your response to my first letter to you all "Exhibit B", you stated that in section 4.5 "TPG" may freeze, reverse, debit or refuse to remit any account due to suspicious activity, however, you failed to state that this must be investigated, although you said you investigated in Mid-February, there was no proof. If you have proof, please provide the proof to me.

Moreover, your company stated that the IRS issued the tax refunds in error, however, in "Exhibit B" in the voice recording of me speaking to the IRS, they diluted and stated the opposite. Your company also stated that you never reached out to the tax-filers, but your company sent out emails to my clients, as shown in "Exhibit B".

I have been in business for over a decade, and I am an honest businessman, with no criminal background, and according to your ERO agreement section **2.4 Authorization for Background and Credit Check** so to be accused of being a "fraud" is not only harsh, but is defamation on your end. Without proof, your case is weakened. I demand that all of my funds be released immediately, or your company mail a check out so that I can close my account, and resume my business.

Furthermore, your company stated that you did not talk to my clients, but in fact you had some form of communication with them, through emails, as shown in "Exhibit C". Your company also released some of the funds to my clients, as shown in "Exhibit D", I have close contact with all of his clients (1,000 plus clients), as shown in "Exhibit D". Also, the clients willingly gave me their address and SSN, as shown in "Exhibit E", meaning there is no fraudulent activity to be suspected.

Lastly, as business owners/professionals, I am more than certain that you are aware that clients become impatient when they feel as if something is not going how they think it should go, so complaints are normal. However, it is not normal to freeze a client's account on hearsay. Let this letter serve you as a final warning to release my assets. If your company do not release my assets, further legal action will be taken, which will result to the asking of legal fees, court cost, financial damages, emotional and mental anguish. You have thirty (30) days to respond to this letter, or a suit will be filed on my behalf.

Hope to hear from you soon.

Sincerely,

Denzello Tucker

# EXHIBIT C



**A Green Dot Company**

July 27, 2021

Denzelle Tucker
602 Tennessee St. 20.
Memphis, TN 38103

Dear Mr. Tucker,

This letter is in response to your letter addressed to Ms. Juhan dated July 9, 2021 delivered via e-mail to kjuhan@greendotcorp.com on July 12, 2021 ("E-mail"). A second letter, dated June 4, 2021, was also included in the E-mail. It was not until July 12, 2021 either letter was received and reviewed by an employee of Green Dot Corporation ("GDC"). Prior to this, GDC communicated with David Cocke at Evans Petree PC, the attorney hired to represent you in this matter. GDC sent a letter to Mr. Cocke on April 23, 2021 ("Attorney Correspondence") and that was the last known communication on the matter since receiving the E-mail, which also stated he was no longer your attorney of record in the matter.

As stated in the Attorney Correspondence, Santa Barbara Tax Products Group, LLC ("TPG"), a wholly-owned subsidiary of GDC, in coordination with the Internal Revenue Service ("IRS") conducted an investigation into the operations of Tax Solutions. This investigation, which began mid-February, has identified numerous indicia of fraud pertaining to certain tax refunds owed to those taxpayers that had utilized the refund transfer services at Tax Solutions ("Disputed Tax Refund Amounts"). On this basis, TPG withheld the Disputed Tax Refund Amounts between mid-February and April 21, 2021, on which date the IRS definitively determined that it had issued certain tax refunds in error. The IRS instructed TPG to return the Disputed Tax Refund Amounts, which contained the tax preparation fees you claim are due to you, to the Bureau of Fiscal Service of the United States Department of the Treasury immediately. TPG did so and GDC advised in the Attorney Correspondence that the processing of these Disputed Tax Refund Amounts may take several weeks. GDC also stated that you would need to contact the IRS directly to obtain further information on the status of the Disputed Tax Refund Amounts, and provided the associated reference lead number available at that time.

To address the points in your letter dated June 4, 2021, TPG can rely on the language of section 3.6 of the Financial Services Agreement ("FSA") you executed on December 17, 2020, which states "any suspicion of fraud by [TPG] or Bank among Participant's requests may result in Participant's immediate suspension or termination from the Program, and withholding the remittance of Participant Service Fee Payments...." There is no obligation on the part of TPG to have "fully investigated the activity" and prove that fact by providing



**A Green Dot Company**

records before taking such action. There is also no prescribed method in the FSA of providing notice for terminating a customer from the program.

Second, we cannot verify your claim that the IRS denied issuing tax refunds in error in the voice recording you provided due to the lack of context and integrity of the recording. We have relied on repeated and explicit written instructions from the IRS to return the Disputed Tax Refund Amounts.

Third, TPG denies communicating with your taxpayers via e-mail or text message. The exhibits you've provided are screen shots of TPG's website viewed from a mobile device. TPG does not have the infrastructure to communicate with taxpayers via text message. TPG communicates with taxpayers via e-mail only to notify a taxpayer of a past due tax preparation fee in the event of an unfunded tax refund, and for purposes of customer service support.

Fourth, despite the on-boarding diligence TPG conducted with regard to you and the Tax Solutions business and the trust your clients may instill in you, TPG still maintains the rights in section 3.6 and section 4.5 of the FSA, which states that TPG "may, in its sole discretion, freeze, reverse, debit or refuse to remit from [TPG]'s account via ACH [tax preparation and electronic filing fee] payments (i) that are associated with tax returns that are in dispute or activity that [TPG] considers fraudulent or suspicious...." To reiterate, TPG was compelled to return the funds it had in its possession to the IRS based on an investigation and no longer is in possession of the Disputed Tax Refund Amounts.

To conclude, the IRS advised us that it issued certain tax refunds in error and instructed us to return the Disputed Tax Refund Amounts to the Bureau of Fiscal Service of the United States Department of the Treasury. As we previously advised your attorney, to resolve the matter, you must contact the IRS.

Respectfully,
TPG Complaint Department

PO Box 70010
Pasadena, CA 91117

**T** 800.779.7228
**F** 858.430.3101

**www.sbtpg.com**

# EXHIBIT D

# Santa Barbara Tax Products Group

## 2021 Financial Services Agreement

**PLEASE READ THIS AGREEMENT CAREFULLY.**

Background: Santa Barbara Tax Products Group, LLC ("Provider") provides a program (the "Program") in which tax preparers have the opportunity to offer refund processing services to taxpayers, including spouses who are filing joint tax returns, who desire to take advantage of the Program and who sign a Program Application and Agreement (each a "Customer"). Provider, using banking services of Civista Bank ("Bank"), is willing to offer refund processing services as described herein. Provider will be responsible for the Program's compliance with applicable law and the ERO User Manual and Best Practices Guide that have been made available to you, the tax preparer ("you" or "Participant") at www.sbtpg.com (the "Program Guidelines"). This 2021 Financial Services Agreement ("Agreement") is by and between you, Bank and Provider and sets forth the rights and obligations of each party in connection with the Program.

I.    MUTUAL AGREEMENT. Subject to the terms and conditions set forth in this Agreement and relying on the representations, warranties and covenants contained herein, Participant, Provider and Bank will provide the services described in this Agreement to facilitate the delivery of federal and/or state income tax refunds to Customers of the Participant.

II.   PARTICIPANT'S REPRESENTATIONS AND WARRANTIES. Participant makes the following representations, warranties, and acknowledgements to Bank and Provider as of the date of this Agreement and at all times during the term hereof:

2.1 Participant Qualifications. (a) Participant has all licenses, approvals, qualifications, authority, and authorizations necessary or appropriate to prepare and file tax returns and to participate in the Program and offer Program services to its Customers in accordance with applicable federal, state or municipal law; (b) Participant is not subject to restrictions or disciplinary action of the IRS or any other federal, state or municipal governmental or professional regulatory body, including, but not limited to, enforcement actions, civil investigative demands or cease and desist orders and, to its knowledge, is not under investigation for fraud or misconduct; (c) except as disclosed to Provider and Bank in writing, Participant is not a party to any lawsuit, arbitration, or legal proceeding; (d) except as disclosed to Provider and Bank in writing, neither Participant nor any person who directly or indirectly has a 5% or greater equity interest in Participant or serves as general partner, member, officer, or director of Participant (each, a "Related Person") has ever been convicted of any crime of fraud, dishonesty, breach of trust, or money laundering, nor entered a pretrial diversion program in connection with such offense, and neither Participant nor any Related Person has suffered any judgment or agreed to any settlement in a lawsuit or other proceeding alleging that Participant or such Related Party has engaged in fraud or any unfair or deceptive act or practice; (e) except as disclosed to Provider and Bank in writing, Participant has never been terminated by some other similar vendor offering tax refund-related financial products, and (f) if Participant is a business entity, it is properly organized and in good standing, and the person executing this Agreement is authorized to do so. These representations and warranties shall each be deemed an ongoing representation and warranty from Participant, and Participant shall provide notice to Provider and Bank immediately of Participant's knowledge that any of the foregoing representations or warranties shall cease to be true at any time during the term of this Agreement.

2.2 <u>Valid EFIN and PTIN</u>. Participant represents that all individual tax preparers performing tax preparation services and providing access to the Program are conducting such participation under Participant's current registered Electronic Filer Identification Number (EFIN) and that each preparer has a valid Preparer's Tax Identification Number (PTIN). Participant understands that Participant will be suspended or terminated from the Program immediately if Participant violates this requirement. Participant further understands that Participant is responsible for all preparers and is responsible for all Program related activity originating by all preparers from Participants' Office, including the actions of any employees or tax preparers.

2.3 <u>Affirmation</u>. Each request that a refund be delivered to Bank constitutes an affirmation by Participant that (a) it has complied with each of its duties and obligations described in this Agreement, (b) there has been no default in the terms or conditions of this Agreement, and (c) the representations and warranties of Participant are true and accurate as of the date of the request.

III.     PARTICIPANT'S DUTIES AND OBLIGATIONS. Participant covenants and agrees with Provider and Bank as follows:

3.1 <u>Compliance</u>. Participant agrees to comply with all procedures and requirements relating to the Program provided by Bank or Provider prior to or during the 2020-2021 tax filing season, including program guidelines set forth in the Program Guidelines. Participant and tax preparers working for Participant must complete and pass any training and compliance testing required by Provider.

3.2 <u>Completion of Application and Tax Returns; Proper Identification</u>. Participant shall obtain a copy of the Program Application and Agreement (the "Application") executed by a potential Customer before directing to Bank any refund due to that individual or otherwise attempting to provide Program services to that individual. Participant shall accurately input and submit with each Application and tax return all material information, including social security number(s), received from Customers. Participant shall ensure that the Customer has presented at least one form of unexpired picture identification issued by a government agency, and shall properly verify the social security numbers of primary and secondary filers as well as all dependent children listed on the tax return.

3.3 <u>Valid Income Documents</u>. Participant agrees to carefully scrutinize each income document, such as W-2s and Form 1099s, to ensure that they have been issued by a valid entity. Participant shall not accept questionable income documents or file any return relating thereto.

3.4 <u>Fees</u>. Participant agrees that it will: (a) advise Customers that the IRS is in no way involved in or responsible for the Refund Transfer ("RT"), (b) advise Customers of all fees and other known deductions to be paid from their refund and the remaining amount Customers will receive, (c) secure the Customer's written consent as required by Treas. Reg. § 301.7216-3(a) to disclose tax information to the Bank in connection with the application for an RT, (d) provide Customers with a statement of the inclusive price of an RT (including all fees incurred to receive an RT), and a separate statement of the fees related to tax preparation and/or other services, (e) will not impose higher fees for tax preparation based on whether or not a Customer chooses an RT, and (f) will not impose higher fees for tax preparation based on whether or not a Customer claims the earned income tax credit, other than incremental fees for additional forms or preparer time.

3.5 <u>Unacceptable Practices</u>. Participant shall not engage in any unfair, deceptive or unconscionable practices, including but not limited to the following: telling consumers they must apply for the Program in order to receive their refund, charging excessive fees or fees unrelated to the preparation and filing of a tax return, basing the fees on a percentage of the refund amount, failing to provide the consumer with any required Program disclosures, requiring a consumer to sign disclosures before reading them, requiring a consumer to sign blank

forms, misrepresenting any material fact concerning the Program or any particular service, including pricing or timing of tax refund disbursements, participating in any program through Provider or any other third party in circumstances where Participant is not eligible to participate, or steering a consumer to a particular service when that consumer has expressed a desire for a different service. Participant may be suspended or terminated from the Program at the discretion of Provider or Bank if Provider or Bank has cause to believe that Participant has engaged in unacceptable practices. A list of unacceptable practices is provided in the Program Guidelines; however, it remains the sole discretion of Provider or Bank to determine whether or not Participant has engaged in behavior deemed to be "unacceptable".

3.6 <u>False Information</u>. Participant shall take reasonable steps to ensure that each Application and related tax return is complete and accurate. Participant shall not knowingly assist any person in fraudulently obtaining Program services and shall not knowingly transmit false or incomplete information to Provider, Bank or the IRS. Participant agrees to notify Provider and Bank immediately if Participant becomes aware of any attempt to obtain Program services by fraud or pursuant to any untrue or false tax return. Any breach by Participant of its obligation under this Section 3.6 shall, and any suspicion of fraud by Provider or Bank among Participant's requests may, result in Participant's immediate suspension or termination from the Program, and withholding the remittance of Participant Service Fee Payments, if any, as set forth in Section 4.5.

3.7 <u>Completed and Signed Tax Return</u>. To participate in the Program for a Customer, Participant shall complete the direct deposit designation in the electronic portion of the Customer's Federal (and State, if applicable) income tax return. The designation shall also indicate that the account is "checking" and that the source is "other". Participant shall cause the same information to be contained in the appropriate data fields as part of the electronically filed return. Participant shall obtain the Customer's signature on the e-filed tax return in accordance with IRS regulations.

3.8 <u>Customer Copies</u>. Participant shall ensure that each Customer has had ample opportunity to read the Customer's Application and the disclosures before the tax return is submitted and shall thereafter obtain the Customer's signature on such Application. Participant shall deliver to each Customer a copy of the signed Application for the Program services requested by the Customer, together with any other agreements or documents that Provider reasonably may require, as identified and provided to Participant.

3.9 <u>Document Retention and Destruction</u>. Participant shall retain with respect to each Customer a paper or electronic copy of the Customer's signed Application, together with copies of all the tax returns, W-2s, and (to the extent feasible) Customer identifications, for a period of seven (7) years, and, upon request, shall deliver the same to Provider or Bank within 48 hours. Participant shall safeguard Customer information in accordance with the Federal Trade Commission's Safeguards Rule (16 CFR §314.1, *et seq.*), IRS Publication 4557 and IRS Publication 4600. Participant shall make sure that any Customer documentation that is not retained is completely shredded before discarding.

3.10 <u>Secure Check and Card Storage and Handling</u>. If the Program approved for the Participant provides a check disbursement option, Participant shall be provided an allotment of check stock that may include certain codes and other information and is to be used to print consecutively numbered disbursement checks ("Checks") for disbursing Program funds. Participant understands that, if printing Checks or offering prepaid or debit cards ("Cards") on site, Participant agrees to store the Check and Card supplies in a secure, locked area in the same manner as it stores cash, and to allow access to authorized personnel only. Participant shall ensure that all unused Checks and any Cards are returned to Provider in accordance with the instructions provided in the Program Guidelines. Participant acknowledges that mishandling of Check or Card supplies may be cause for immediate suspension or termination from the Program.

3.11 <u>Delivery of Funds</u>. Upon Bank's receipt of a Customer's refund and authorization from Provider delivered to Participant indicating the amount due the Customer, Participant may affix to a Check the facsimile signature of the authorized Bank signatory and deliver the Check to the Customer. Participant shall maintain possession of each Check until delivery has been authorized by Bank and shall not use any of the Check supplies except as specifically provided in this Agreement. Participant shall not deliver any replacement Check or otherwise issue more than one copy of any Check for any refund without the specific authorization of Bank.

3.12 <u>Lost/Stolen/Voided Checks and Misdirected ACH Deposits</u>. Participant shall reimburse Bank, within 15 days of Bank's notice, for any losses attributed to the Participant or its employees for a misdirected ACH direct deposit. Participant shall further reimburse Bank, within 15 days of Bank's notice, for any and all loss incurred by Bank related to any Check that was duplicated, delivered to the wrong person, voided by Participant's office, lost by or stolen from Participant or for any other loss related to Participant's failure to protect and handle the Check supplies in accordance with this Agreement. Nothing in this Section shall affect or diminish Provider's right to deduct amounts due from any funds in its possession that would otherwise be due to Participant as provided in Section 4.5 below. Bank shall deliver to Participant any sums later recovered for losses for which Participant has reimbursed Bank.

3.13 <u>Compliance with Laws; Customer Consents</u>. Participant shall comply with all applicable federal, state and municipal laws, rules, and regulations (including, without limitation, applicable state and municipal licensing, registration and disclosure requirements) relating to the preparation and transmission of income tax returns and Participant's performance under this Agreement. Participant accepts full responsibility for obtaining Customer written consents, on behalf of Provider and Bank, in connection with the offer and the sale of Program services.

3.14 <u>Advertising and Marketing</u>. Participant shall not misrepresent or mischaracterize the Program or its availability in any marketing or advertising. Participant shall also not misrepresent or mischaracterize its relationship to Bank or Provider in any marketing or advertising (including business cards). All marketing materials provided by Provider may only be used for the purposes originally intended. Provider and Bank's logos and trademarks are copyrighted materials and shall not be used except as authorized by or with the express written permission of Provider or Bank. Any advertising or marketing material developed or reproduced by Participant must conform to the standards set forth in the Program Guidelines and be approved in writing by Provider prior to use. Unless Participant opts out using Provider's enrollment platform, Participant agrees that Provider may directly contact Customers using Provider's services regarding products or services as long as Provider takes no action whatsoever to encourage such Customers to leave Participant for tax preparation services.  Participant understands and acknowledges that Provider's goal with respect to contacting Customers is to implement programs to increase retention of Customers in Participant's offices. After completion of the enrollment process, Participant may withdraw its consent to Customers receiving promotional and marketing emails at any time by logging in to Provider's website at www.sbtpg.com.

3.15 <u>Proper Documentation</u>. Participant shall not document any Program transaction using any documents other than the documents, including the Program Application and Agreement, provided by Provider and Bank. All Program contracts are in the English language, and English is the controlling language in all contracts. Any non-English translations of Program forms provided or made available by Provider are for Participant's and Customers' convenience only and may not accurately represent the information in the original English.

3.16 <u>Material Changes</u>. Participant will not implement any material changes in policy, procedure, or training with respect to the Program without the prior written consent of Provider and Bank.

3.17 <u>Payment of Tax Preparation Fee</u>. Participant shall not collect its tax preparation/electronic filing fee (the "Participant Service Fees") directly from the Customer in cases where the Customer purchases Program services. Rather, Participant Service Fees shall be paid to Participant as described in Section 4.5 below. Notwithstanding the foregoing, Participant agrees that it is not entitled to (and will not receive) any Participation Service Fees that are not properly disclosed in the Application.

3.18 <u>Continuation of Tax Preparer Services</u>. Participant acknowledges and agrees that Participant's tax preparer services with respect to a Customer shall continue, and Participant's Participant Service Fees with respect to the Customer shall not be due and payable, until such time as the Customer's tax refund is disbursed to the Customer under the Program, or such later time as it appears that no tax refund will be received by the Customer.

3.19 <u>Taxpayer Advance Programs</u>. If Participant's tax software transmitter ("Transmitter") and Participant participate in a taxpayer advance program ("Advance Program") offered by an independent third party, the following shall apply: (a) Participant shall owe Provider a fee in an amount that will be disclosed to Participant prior to commencement of the Advance Program for each funded advance (the "Funded Advance Fee"), provided that such fee is subject to adjustment by Provider upon notice to Participant in the event Participant does not qualify for the standard Advance Program, (b) Participant authorizes Provider to deduct the Funded Advance Fee from any tax preparation fees, and (c) no RT-related fees and no tax preparation fees will be paid to Participant when a Customer selects an advance and does not select an RT. Participant cannot pass the Funded Advance Fee directly through to the Customer who receives the advance. If Transmitter and Participant participate in the Advance Program and in instances where a Transmitter charges a transmission fee, such transmission fee shall be paid by Participant. Participant cannot pass the transmission fee through to the Customers who receive the advances. Participant's eligibility to participate in the Advance Program is based upon certain criteria, including Participant having a sufficient rate of IRS tax refund funding in the prior tax season. If Participant offers or participates in an Advance Program for which Participant is not eligible, Participant may be liable for losses under such Advance Program. Participant shall advise Customers, if applicable, that (i) advances may be interest bearing and are not a quicker way of receiving their refunds from the IRS; and (ii) if the Bank does not receive a direct deposit within the expected time frame for whatever reason, Customer may be liable to the advance provider for additional interest. Participant's and Provider's consent and agreement to this section will be irrevocably confirmed when Participant transmits an Application to Provider and that Application is accepted and processed by Provider.

3.20 <u>Unpaid Fees Collection Service</u>. Provider offers a collection process ("Collection Program") in which it facilitates, on behalf of Participant, the collection of Participant's tax preparation fees and certain other fees charged to the Customer that are not paid as a result of the tax refund not funding or not funding in an amount sufficient to pay such fees. Provider shall make reasonable efforts to collect such amount by debiting Customer's bank account. This process only applies for those Customers where the Customer has selected ACH as a disbursement method. Participant shall have the ability to exclude any particular Customer from the Collection Program. When such fees are collected, Provider shall retain a fee of 25% of the amount collected (the "TPG Fee") and remit the balance to Participant or if other fees are collected, remit such fees, less the TPG Fee, to the appropriate third parties. Returns eligible for the Collection Program shall be limited to returns filed on or before the federal filing deadline. Collections under the Collection Program will begin at least three weeks after the Customer's date of filing and may continue for up to one year thereafter (the "Collections Period"). Provider shall remit Participant's portion of fees within 45 days after the end of the Collections Period. **Participant is automatically enrolled in the Collection Program. If Participant desires to opt out of the Collection Program entirely, Participant must opt out at** www.sbtpg.com **on or before March 13, 2021.** If Participant does not opt out, Participant remains able to request any specific Customers be excluded from the Collection Program.

3.21 <u>Complaint Resolution</u>. If Participant or a Related Person receives notice of a complaint from a Customer regarding Programs, Services or any third party, including any government, regulatory, consumer protection or consumer advocacy agency (collectively a "Complaining Party"), it will promptly forward such complaint and any written documentation related to such complaint to Provider for review, investigation and resolution. Unless otherwise instructed or permitted by Provider, Participant shall not respond to any Complaining Party on behalf of Provider or Bank. Participant shall use reasonable efforts to cooperate with Provider or Bank in the reasonable resolution of any such complaint.

3.22 <u>Press Release</u>. Participant shall not issue any press release (or make other public announcement) related to this Agreement or the transactions contemplated hereby without prior written approval of Provider.

IV.  <u>PROVIDER'S DUTIES AND OBLIGATIONS.</u>

4.1 <u>Processing Applications</u>. Provider shall use reasonable commercial efforts to process Applications in a timely manner in accordance with industry standards. Provider shall establish criteria and fees relating to Program services in Provider's sole discretion, subject to the rights of the parties under this Agreement.

4.2 <u>Changes in the Program</u>. Provider may at any time discontinue or modify the Program if in Provider's sole judgment the continued offering of Program is impractical, potentially unprofitable, or in conflict with applicable law.

4.3 <u>Check Supply</u>. Provider shall provide to Participant a supply of blank Checks that Provider determines is sufficient for the expected needs of Participant. Participant shall notify Provider at any time that Participant determines the supply of Checks is not sufficient, and Provider will supply any additional Checks that it determines are needed. Provider shall monitor the Checks used by Participant, shall notify Bank of any Checks used in ways that are not permitted by this Agreement, and shall ensure the secure destruction of all unused Check stock used in connection with the current tax season or any prior season. Participant agrees that it shall be liable for any and all costs, expenses and damages incurred by Provider, Bank or any Customer in the event Participant uses the incorrect check stock.

4.4 <u>Determination of Payments</u>. Provider shall determine the amount due to Participant, the amount of the fees due to others and the amount due to the Customer and shall provide that information to Bank.

4.5 <u>Participant Service Fee Payments</u>. Provider shall collect Participant Service Fees by withholding the fees from the Customer's refund, by ACH direct debit of the Customer's personal bank account or by processing a credit card charge on behalf of the Customer to the credit of the Participant.  Provider shall collect a processing charge for collecting each Participant Service Fee. The processing charge will be collected from the Customer's refund or deducted from the Participant's Service Fee before forwarding the Participant's Service Fee to the Participant or the refund to the Customer. On credit card charges, Participant will pay, in addition to the processing charge, any applicable interchange rate and Provider will collect and pay said rate from the Participant Service Fee before forwarding the fee payment to Participant. Participant Service Fee payments minus processing charges and any applicable interchange rate shall be made via ACH deposit to the bank account of Participant within one business day after funding, subject to offset rights as provided below. Participant hereby authorizes Provider to offset from Participant's bank account or from Participant Service Fee any amounts owed by Participant to Provider or Provider's affiliated companies (including but not limited to funds or advances to Participant for pre-season or in-season business expenses) now or in the future, regardless of whether such obligation arises under this Agreement or under any other commitment made by Participant. Provider may also offset from Participant Service Fee any amounts owed by Participant to providers of third-party products or services, now or in the future, related to Participant's business or the preparation

and filing of tax returns, including but not limited to audit protection or assistance fees, service bureau fees or transmitter software license fees. Provider shall not be responsible to Participant for any Participant Service Fees that cannot be collected. Provider may, in its sole discretion, freeze, reverse, debit or refuse to remit from Provider's account via ACH Participant Service Fee payments (i) that are associated with tax returns that are in dispute or activity that Provider considers fraudulent or suspicious, or that could, in Provider's reasonable determination, result in losses to Provider (for example, if Provider receives notice that multiple refund disbursement checks have been issued or cashed in error), (ii) to ensure Participant's completion of compliance requirements or corrective action, or (iii) to reimburse Provider for payments to Customers due to Participant's noncompliance with contractual or regulatory requirements. Participant Service Fees held by Provider as set forth above may be (i) retained by Provider as payment for its costs and damages, (ii) released or paid to Participant upon Participant's completion or satisfaction of compliance requirements or corrective action, or (iii) paid by Provider to Customers, as applicable. **Notwithstanding the foregoing, after one year all Participant Service Fees held by Provider as set forth above shall be forfeited to Provider as additional consideration owing to Provider under this Agreement.**

4.6 <u>Compliance with Laws</u>. Provider covenants and agrees that all Program documentation provided to Participant, and Provider's performance under this Agreement, shall comply with applicable laws, rules, and regulations.

## V.    BANK'S DUTIES AND OBLIGATIONS.

5.1 <u>Receipt and Deposit of Refunds</u>. Subject to the terms and conditions of this Agreement, upon receipt of a federal or state refund due to a Customer, Bank shall establish a book entry for the Customer. Bank shall deposit the refund into an account in the name of Bank used to hold such refunds.

5.2 <u>Authorization of Check</u>. For Customers that authorize delivery of their refund by Check, Bank shall authorize Participant to deliver to the Customer a Check for the balance of the refund indicated by Provider to remain after all authorized fees and charges have been deducted.

5.3 <u>Calculation of Amounts</u>. Participant acknowledges that Provider will determine the amounts to be deducted from any refund, including the fees to be deducted, and will provide to Bank the amount of each deduction, the amount due to the Customer and the delivery instructions of Customer. Bank shall have the right to rely on the information from Provider and shall have no obligation or liability related to any inaccuracy in such amounts or any other instruction that it received from Provider.

5.4 <u>Rights and Limitations</u>. In performing its services, Bank shall not be under any duty to handle the Program funds or any sums in its possession pursuant to this Agreement with any greater degree of care than it gives to other funds held on behalf of its customers. Bank may act in reliance on any instructions that Bank believes to be genuine, and it may assume that any person who provides such instructions on behalf of Participant or Provider has been duly authorized to do so. Bank may act upon advice of counsel with respect to any matter related to this Agreement and shall not be liable for any mistake of fact or error of judgment, or acts or omissions of any kind, unless caused by the willful misconduct of Bank. Bank is not obligated to perform any activity or service related to the Agreement except the actions that are specifically described herein. Bank shall have the right to suspend its services for Participant at any time. Neither Bank nor Provider is responsible for the misapplication of refunds that results from error, negligence or malfeasance on the part of Participant or Participant's offices.  In the event Bank or Provider has received the Customer's tax refund but Bank or Provider is unable to deliver the tax refund proceeds to the Customer for any reason, the funds will be returned to the IRS or the appropriate state taxing authority.

VI. <u>TERM</u>.

6.1 <u>Term</u>. This Agreement shall become effective on the date Participant transmits an Application to Provider and that Application is accepted and processed by Provider and shall continue until December 31, 2021, unless the parties have agreed in writing separately on a longer term, and in such event, such longer term shall apply.

6.2 <u>Termination</u>. This Agreement may be terminated by Provider immediately upon notice to Participant if Provider reasonably suspects that Participant has breached any of the representations made or has materially defaulted in the performance of any of Participant's obligations hereunder. Bank may terminate this Agreement at any time for any reason.

6.3 <u>Return of Proprietary Information and Checks</u>. Upon termination of this Agreement, Participant will return to Provider all proprietary and confidential information received in connection with this Agreement and certify in writing to Provider that Participant has not retained any copies of such proprietary or confidential information. Participant shall also deliver to Provider all Checks provided to Participant by Provider and shall certify in writing to Provider and Bank that all Checks in Participant's possession have been returned.

6.4 <u>Survival</u>. Termination of this Agreement shall not affect the obligations or liabilities of a party arising from events that occurred before the termination. In addition, the obligations described in Sections 3.9, 3.12, 3.20, 3.21, 4.3 (as to return and destruction of Checks), 5.3, 5.4, 6.3, 6.5, 7.2, 9.3, 9.6, 9.8 and 9.13 and Articles VII and VIII shall survive any termination of this Agreement.

6.5 <u>Prior Obligations</u>. Termination of Participant's participation in the Program shall not relieve Participant of any obligations it may have with respect to Program services provided or requested prior to termination.

VII. <u>PRIVACY AND CONFIDENTIALITY</u>.

7.1 <u>Privacy</u>. No party shall make any unauthorized disclosure of or use any personal information of Customers that it receives from the other or on the other's behalf other than to carry out the purposes for which such information is received, and each party shall comply, to the extent applicable, with the Gramm-Leach-Bliley Act of 1999 ("GLBA"), implementing regulations of GLBA, including but not limited to the FTC's Financial Privacy Rule, 16 CFR 313.1 *et seq.*, the FTC Safeguards Rule 16 CFR 314.1 *et seq.*, the FTC Disposal Rule 16 CFR 682.1 *et seq.*, and any other applicable federal or state law privacy requirements and applicable identity theft laws and regulations.

7.2 <u>Confidentiality</u>. Any information related to a Customer's Application or the disbursement of the Customer's refund which is provided to the Participant by the Customer or by Provider shall be considered confidential information and Participant shall take reasonable precautions to protect the confidential information from disclosure to the same extent that it would safeguard its own confidential information and data. Such confidential information shall not include information which otherwise may be generally available to the public. Participant specifically agrees not to disclose the confidential information to any other person or firm, other than Provider and Bank, except pursuant to court order or subpoena.

7.3 <u>Performance Information Sharing</u>. Participant authorizes Provider to share Participant performance data including volume statistics and funding history with other banks from time to time.

7.4 <u>Security of Customer Information</u>. If a Customer's information becomes compromised in any way, Participant must notify Provider and Bank immediately and take any steps necessary to prevent the information from being further compromised.

VIII. <u>INDEMNITY</u>.

8.1 <u>Indemnification by Participant</u>. Participant shall indemnify, defend, and hold harmless Bank, Provider and their officers, directors, employees, and agents from and against any and all expenses and costs (including reasonable attorney's fees and court costs) or liabilities (including amounts paid in settlement) incurred by them in connection with any claim, dispute, controversy, or litigation ("Claim") arising out of or resulting from any breach by Participant or any employee or agent of Participant of any of Participant's representations or obligations hereunder.

8.2 <u>Indemnification by Provider</u>. Provider shall indemnify, defend, and hold harmless Participant and Participant's officers, directors, employees, and agents from and against any and all expenses and costs (including reasonable attorney's fees and court costs) or liabilities (including amounts paid in settlement) incurred by any of them in connection with any Claim arising out of or resulting from any breach by Provider of any of Provider's obligations hereunder; provided, Provider shall not be liable to Participant for the foregoing to the extent arising from Participant's material breach of this Agreement, gross negligence or willful misconduct. **To the extent permitted by applicable law, Participant expressly waives any Claim or right of action it could otherwise pursue against Bank and agrees not to pursue or threaten any lawsuit against Bank and instead to assert any rights to monetary compensation arising hereunder solely against Provider.**

IX. <u>OTHER AGREEMENTS</u>.

9.1 <u>Relationship of Parties</u>. Participant, Provider and Bank are each independent parties to this Agreement, and this Agreement shall not establish a joint venture, partnership, agency or employment relationship between any party and any other party for any purpose whatsoever. No party shall hold itself out as having any right, power or authority to create any contract, obligation or commitment on behalf of or binding upon any other party.

9.2 <u>Exclusivity</u>. Participant agrees not to submit Applications for any Program services that Provider makes available, or any products substantially similar thereto, on behalf of any individual to any entity other than Provider while participating in the Program without the express permission from Provider. Any breach of this Section 9.2 will result in Participant's immediate suspension or termination from the Program.

9.3 <u>Audit and Inspection</u>. Upon request, Participant will provide Bank or Provider and/or its accountants, representatives and regulators with access to its offices, employees, and records, sufficient for Bank or Provider and/or its accountants, representatives, and regulators to determine Participant's compliance or non-compliance with the terms of this Agreement, and, within 48 hours after request therefore, will provide Bank or Provider and/or its accountants, representatives, and regulators with copies of any and all documents requested hereunder relating in any way to this Agreement, the Program or any Customer.

9.4 <u>CLASS ACTION WAIVER</u>. Any Claim must be brought in the respective party's individual capacity, and not as a plaintiff or class member in any purported class, collective, representative, multiple plaintiffs, or similar proceeding ("Class Action"). The parties expressly waive (except as prohibited by law) any ability to maintain any Class Action in any forum. Any Claim that all or part of this Class Action Waiver is unenforceable, unconscionable, void, or voidable may be determined only by a court of competent jurisdiction. THE PARTIES UNDERSTAND THAT THEY WOULD HAVE HAD A RIGHT TO BE PARTY TO A CLASS OR REPRESENTATIVE ACTION. HOWEVER, THEY UNDERSTAND AND CHOOSE TO HAVE ANY CLAIMS DECIDED INDIVIDUALLY.

9.5 <u>JURY WAIVER</u>. THE PARTIES HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVE, UNLESS PROHIBITED BY STATUTE, ANY RIGHT WHICH ANY PARTY MAY HAVE TO TRIAL BY JURY IN RESPECT OF ANY

PROCEEDING, LITIGATION OR COUNTERCLAIM.  NO PARTY TO THIS AGREEMENT SHALL SEEK TO CONSOLIDATE ANY SUCH ACTION IN WHICH A JURY TRIAL CANNOT BE WAIVED.

9.6 <u>Limitation of Liability</u>. No party shall be liable for incidental, special, indirect, or consequential damage or loss of profits or other benefits, arising out of or in connection with the performance (or failure thereof) of its obligations hereunder, unless such damage or loss arises from that Party's gross negligence or willful misconduct.

9.7 <u>Excusable Delay</u>. No party shall be liable to any other party for any delay in performance or nonperformance of its obligations under this Agreement where such delay or nonperformance is caused by circumstances or acts beyond its control, including failure of communication lines, equipment or systems of third parties; acts of God; civil disturbances; war or other violence; strikes or labor disputes. In the event of any force majeure occurrence as set forth in this Section, the disabled party shall use its best efforts to meet its obligations as set forth in this Agreement. The disabled party shall promptly and in writing advise the other party if it is unable to perform due to a force majeure event, the expected duration of such inability to perform and of any developments (or changes therein) that appear likely to affect the ability of that party to perform any of its obligation hereunder in whole or in a part.

9.8 <u>Attorneys' Fees</u>. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees and court cost, incurred by the prevailing party to enforce this Agreement, including collection of amounts owed under this Agreement.

9.9 <u>Notices</u>. Any notice required or permitted to be given hereunder shall be in writing and shall be deemed to have been given on the date of delivery, if made personally or by facsimile transmission, or on the second business day after mailing, if mailed by registered or certified mail, return receipt requested. Notices shall be sent to Provider at 11085 North Torrey Pines Road, Suite 210, Attn: Professional Division, La Jolla, CA 92037, with a copy to Provider's Legal Department at 3465 East Foothill Boulevard, Pasadena, CA 91107, and to Participant at the address on file in Provider's records or such different address as Participant may provide to Provider by notice in accordance with this Section 9.9. Notices to Bank shall be sent to the attention of Richard J. Dutton, Civista Bank, 100 E. Water Street, Sandusky, Ohio 44870.

9.10 <u>Integration</u>. This Agreement expresses the entire understanding and agreement of the parties concerning to the subject matter hereof, and supersedes all prior agreements, understandings, and arrangements or commitments with respect to such subject matter, written or oral.

9.11 <u>Background and Credit Checks</u>. Participant agrees to provide all requested information to Provider in connection with being considered to participate in, and to continue to participate in the Program, including requested information regarding any Related Person. Prior to and during the term of the parties relationship hereunder, Participant hereby authorizes Provider to obtain information from third parties including consumer reporting agencies, and any third party database that is not consumer reporting agency bearing on Participant's background and reputation, and hereby authorizes such third parties to provide such information to Provider. Participant understands and agrees that such information may include background checks, consumer reports from a consumer reporting agency, reports from any third party databases that are not consumer reporting agencies, and hereby consents to all such requests for information or background checks. Participant agrees to bear the cost of such third party services and Provider may bill and withhold such amounts from Participant Service Fees to be remitted to Participant under this Agreement.

9.12 <u>Governing Law</u>. This Agreement shall be governed and construed in accordance with the laws of the United States and, to the extent state laws applies, the substantive laws of the State of Ohio.

9.13 <u>Waiver</u>. The delay or failure of a party to insist upon another party's compliance with or performance with any term or condition of this Agreement shall not be deemed a waiver of such term or condition; and no waiver shall be binding upon a party unless in writing and signed by such party, and shall then be binding only for that particular instance.

9.14 <u>Assignment</u>. This Agreement is binding on the parties hereto and their successors. Bank or Provider may assign its rights and obligations under this Agreement, but Participant may not assign its rights or obligations under this Agreement without the prior written consent of Bank and Provider.

9.15 <u>Compliance</u>. Participant agrees that Participant is in compliance with the document storage, physical security, data security, training, and advertising standards outlined in this Agreement and in the Program Guidelines, including but not limited to the following:

- Keeping current year Customer documents in a locked room and/or filing cabinet when not in use;
- Keeping prior year Customer documents in a locked room and/or filing cabinet;
- Keeping Check and Card stock in a locked cabinet, safe, or drawer;
- Allowing only Participant or its authorized employees access to Customer documents and information;
- Shredding Customer information when it is not required to be maintained and is no longer needed;
- Requiring users of computers used in the preparation of client tax returns to login with a unique user ID and password;
- Running a regularly updated anti-virus software program on all computers used in the preparation of client tax returns;
- Ensuring and requiring that all of Participant's employees, contractors, or affiliates who will offer or discuss tax refund products or services or who have access to Customer information in conjunction with tax refund products will take the online training course required by Provider.

9.16 <u>AGREEMENT AND CONSENT</u>. By clicking on the "I AGREE" button below, Participant: (1) certifies that Participant has been approved by the IRS to prepare and electronically file income tax returns, and that Participant has a current and valid EFIN; (2) acknowledges that Participant has read, understands and agrees to be bound by all of the terms and conditions set forth in this Agreement; (3) authorizes Provider to conduct background and credit checks pursuant to Section 9.11 of this Agreement; and (4) consents to receiving the Agreement and any Compliance Memo in electronic form. By providing this Agreement to Participant and making the Program available through Participant, Provider and Bank agree to be bound by this Agreement. Participant's and Provider's consent and agreement to all terms and conditions herein will be irrevocably confirmed when Participant transmits an Application to Provider and that Application is accepted and processed by Provider. These terms may be amended and agreed upon by all parties by Provider providing written notice of such amended terms to Participant, Participant transmitting an Application to Provider after receipt of such amended terms, and Provider accepting and processing the Application.

I Agree